

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00408-CV
No. 02-21-00420-CV

———————————————

S.T., Appellant

V.

H.K., Appellee

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-658534-19

**AND**

—————————————————

No. 02-22-00010-CV

—————————————————

IN RE S.T., Relator

Original Proceeding
233rd District Court of Tarrant County, Texas
Trial Court No. 233-658534-19

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

These appeals and original proceeding concern only the property division in a divorce and not the custody provisions, which were resolved by a mediated settlement agreement. S.T.[1] (Husband), appellant and relator, raises several issues challenging the sufficiency of the evidence and the trial court's rulings related to the property division—particularly the rulings related to the parties' real property—as well as the trial court's appointment of a receiver to sell the marital residence. Because we determine that this particular order appointing a receiver is appealable with the final decree, we deny the petition for writ of mandamus in cause number 02-22-00010-CV. And because we determine that the trial court did not abuse its discretion in its property division and that the receiver-appointment order was authorized, we affirm the final decree—including the receiver appointment.

## I. Procedural Background

H.K. (Wife) initially filed for divorce in March 2019, but she did not move out of the marital residence and continued living there with Husband. In April 2019, the parties agreed to temporary orders that allowed Wife to remain living in the marital residence "unless otherwise agreed to in writing or until further order," ordered each party to "continue to pay the monthly bills that [the] respective party ha[d] been paying (status quo)," and prohibited either party from harming the value of their

---

[1]We use initials to protect the identities of the minor children involved. *See* 2d Tex. App. (Fort Worth) Loc. R. 7.

property and from withdrawing funds from any account "except as specifically authorized by" an order of the trial court. The temporary orders authorized Wife and Husband "[t]o make expenditures and incur indebtedness for reasonable and necessary living expenses for food, clothing, shelter, transportation, and medical care" and for "reasonable attorney's fees and expenses in connection with th[e] suit." According to Wife, Husband tried to talk her out of the divorce for several months, and she initially agreed not to proceed.

But in the summer of 2019, Wife decided she could no longer continue with the marriage; therefore, in late June 2019, Wife filed a motion to modify the temporary orders, claiming that living in the marital residence had become unworkable and seeking, among other things, to have the residence listed and sold. Husband filed a counterpetition for divorce on July 30, 2019, and a motion to modify the temporary orders on July 31, 2019; in both, he asked the trial court to grant him exclusive possession of the marital residence pending the divorce and to enjoin Wife from entering or remaining there.

Wife moved out of the house in late July or early August 2019. On August 5, 2019, the trial court's associate judge held a contested hearing to consider modifying the then-current temporary orders. The associate judge's contemporaneous hearing report set forth certain details regarding conservatorship and possession of the children, child support, and temporary possession of property. It also provided that Wife would pay her own monthly expenses for "rent/mortgage," "utilities," and a

3

Mercedes automobile and related insurance, plus "50 percent of the costs associated with extracurricular activities that the children [were] involved in." Although both parties sought a de novo hearing with the presiding trial judge, it appears that one was not held.

The twenty-six-page temporary order signed by the associate judge on October 30, 2019, incorporated the associate judge's report as to expenses to be paid by each party; enjoined the parties from disposing of, encumbering, or harming their property; prohibited account withdrawals except as authorized by court order; and authorized Wife and Husband "[t]o make expenditures and incur indebtedness for reasonable and necessary living expenses for food, clothing, shelter, transportation, and medical care . . . [and] reasonable attorney's fees and expenses in connection with th[e] suit," and "[t]o make withdrawals from accounts in financial institutions only for the purposes authorized by th[e] order."

After a final bench trial on October 6 and 7, 2021, the trial court rendered its ruling in a letter dated October 18, 2021. In the letter, the court granted a divorce, adopted the parties' mediated settlement agreement "on all child issues," and announced the property division. As part of the division, the trial court ordered Husband and Wife to place the marital residence "on the market for sale by October 31, 2021, in accordance with the current market evaluation[,] with a licensed real estate broker." Once sold, "the proceeds from the sale [were to] be divided between the parties 50/50." The letter included the following provision: "Should the parties

4

fail to list the home by October 31, 2021, attorney Lee Owens is appointed receiver to manage the sale of the home. Additionally, [Husband] is responsible for the mortgage of the home until the home is sold."

The trial court also divided as part of the parties' community property an approximately 50/305th ownership interest[2] in land in Bangalore, India (the India Property) that Husband had claimed as his separate property, awarding each party "a 50% interest."[3] Moreover, the trial court awarded each party certain retirement and nonretirement accounts and personal property.

Without considering the parties' personal property to which the decree did not expressly assign a monetary value, the trial court's division of the valued assets and liabilities was an almost 50/50 split, with Wife receiving a total of $884,324.43 in assigned value and Husband receiving $904,378.96. When considered with the awarded 50% interests in the real property, the trial court's property division was roughly 49.4% to Wife and 50.6% to Husband.

---

[2]The remaining 255/305th is purportedly owned by various other family members of Wife.

[3]The trial court was informed during trial that Husband had sued Wife and her family in India to determine ownership of this property. Husband also noted this fact in his amended inventory and appraisement, filed in August 2021.

The parties did not list the marital residence for sale by October 31, 2021, nor did Husband ask to supersede the trial court's ruling before that date.[4] On November 1, 2021, Husband filed a motion to clarify the ruling requiring the sale of the marital residence, arguing that it did not give sufficient detail on material terms—such as the repairs needed to prepare for the listing, how the listing price should be determined, and how the parties were to determine whether an offer must be accepted or rejected—to allow the parties to comply. Husband also argued that it was not possible to timely make the repairs he believed were needed before the house could be listed for sale by the October 31, 2021 deadline—which had already passed. Husband further sought to clarify whether he could buy the home "through a refinancing of the mortgage to pay [Wife] for her equitable share." Finally, Husband objected to a receiver appointment, arguing that no evidence supported that the community estate would suffer irreparable loss without one and that the remedy was unduly harsh in these circumstances.[5]

---

[4]Husband was represented by counsel at trial, but after trial he obtained new counsel, who filed an entry of appearance in the trial court on October 29, 2021. Sometime between October 29 and November 5, Husband hired the law firm that now represents him in this appeal.

[5]Husband also addressed the India Property, seeking a clarification about "how the property will be conveyed or deeded between the parties, whether the property can be partitioned, the value of the property, or the rights of the parties to pursue or defend interests related to the property in the India litigation." This post-trial motion contains no assertion that the India Property is Husband's separate property.

On November 5, 2021, Wife filed a motion for the trial court to sign a final decree, and on November 18, 2021, the trial court conducted an in-person hearing on the motion. At that hearing, Husband's counsel objected to specific parts of the proposed decree. When Husband's counsel objected that the proposed decree included language outside the letter ruling's scope—"The parties shall list the property with a *mutually agreed upon* realtor" and "The parties shall list the property at a *mutually agreed upon* listing price"—the trial court noted that the required listing date had already passed and asked counsel, "So we are actually already at the default of . . . the Receiver being appointed, and the . . . time for agreement has passed . . . ?" [Emphasis added.] Husband's counsel acknowledged that the date had already passed.

Husband's counsel also objected that "the Court [had] received no evidence that the community estate would suffer irreparable harm if a Receiver [were] not appointed" and argued that appointing a receiver would "minimize the community estate value." Wife's counsel pointed out to the trial court that Wife had pleaded for the appointment of a receiver[6] because the marital residence could not be partitioned in kind and that evidence had been adduced at trial that it could not be; he also reminded the trial court about Husband's testimony that he would not cooperate with any sale.

---

[6]Although Wife had pleaded for an order to sell the home, she had not expressly sought the appointment of a receiver to effect that sale.

Finally, Wife's counsel asked whether the parties needed to present the trial judge with an order appointing Lee Owens as receiver. The trial judge responded, "I do need an order so that we can specifically list out the duties and responsibilities of the Receiver . . . ." Husband's counsel did not object.

The same day as the motion-to-sign hearing, the trial court signed a final decree, which incorporated the trial court's October 18 letter ruling, including the provisions (1) requiring the parties to list the home for sale by October 31, 2021, "in accordance with the *current* market evaluation," (2) appointing a receiver if the house were not listed for sale by October 31, 2021, (3) splitting equally the proceeds from the marital home's sale, and (4) awarding Husband and Wife each "[f]ifty percent (50%) of the parties' interest (if any) in the . . . India" Property. [Emphasis added.]

Three days after the trial court signed the decree and a little over a month after issuing its letter ruling—on November 24, 2021—the trial court signed an order appointing a receiver to sell the residence and to divide the proceeds according to the decree.

Upon Husband's request, the trial court filed findings of fact and conclusions of law in support of the decree. Specifically, the trial court found that "[s]ufficient evidence was presented to prove that"

- "partition in kind of the marital home . . . is impractical and unfair,"

- the home "is not subject to partition in kind considering the circumstances, capabilities[,] and experience of the parties,"

• if the property were not sold, Husband and Wife "would each be placed in an unfair disadvantage to purchase another home for themselves and the children,"

• "the Court could not award a money judgment based on the parties' past actions, failure to pay debts, and inability to work together," including Husband's "past behavior and fear that he would not pay" Wife and his "history of refusing to cooperate with [Wife] in regard to the home," and

• "a partition by sale would best serve the parties' interest and preserve the maximum value of the home."[7]

On December 1, 2021, Husband filed in the trial court a motion to suspend enforcement of the decree and receiver-appointment order—"[s]pecifically, the . . . order that the marital residence be sold"[8]—as well as a motion to fix security. The trial court set a hearing on these motions—as well as Wife's later filed motion for temporary orders pending appeal—for January 11, 2022.

On December 8, 2021, Husband filed separate notices of appeal from the final decree (No. 02-21-00408-CV) and order appointing a receiver (No. 02-21-00420-CV), but in neither appeal did he file a motion for emergency relief seeking to stay the receiver's listing or sale of the home. Instead, on January 11, 2022, he filed in this court an original proceeding and accompanying emergency motion for stay (No. 02-

---

[7]The trial court also found that the parties had "presented conflicting testimony as to the value of the marital home with a difference of $264,000 between the two values."

[8]Husband's basis for this motion was that he had filed litigation in India disputing ownership of the India Property and that "the outcome of this pending litigation [would] have a significant impact on the overall value of the parties' estates and reaching a just and right division of their property."

9

22-00010-CV), in which he sought to have the receiver-appointment order reversed or vacated (the same relief he sought in No. 02-21-00420-CV) and also sought a stay of the receiver-appointment order.

On January 12, 2022, the trial court issued a letter ruling denying the three motions heard on January 11, 2022: Husband's motion to suspend enforcement of the decree and receiver-appointment order and motion to fix the amount of security and Wife's motion for temporary orders pending appeal. Thus, the trial court wholly denied Husband the right to supersede the decree's provisions or the marital residence's sale by receiver.[9] *See* Tex. R. App. P. 24.1, 24.2; *L Series, L.L.C. v. Holt*, 571 S.W.3d 864, 878 (Tex. App.—Fort Worth 2019, pet. denied) (noting that because appellate rule 24.1 allows a party to supersede a judgment unless the law or rules provide otherwise, supersedeas generally is matter of right); *Abdullatif v. Choudhri*, 536 S.W.3d 48, 52 (Tex. App.—Houston [14th Dist.] 2017, order [mand. denied]) ("Rule 24 expressly authorizes judgment debtors to supersede both monetary and non-monetary judgments and prescribes the terms on which they may do so.").

We granted the emergency motion for stay in the original proceeding;[10] thus, the marital residence has not yet been sold. Although Wife opposed the entry of our

---

[9]Likewise, the trial court declined to enter temporary orders pending appeal. *See* Tex. Fam. Code Ann. § 6.709.

[10]*See, e.g.*, *Stroik v. Stroik*, No. 02-21-00207-CV, 2022 WL 5240394, at *1 (Tex. App.—Fort Worth Oct. 6, 2022, no pet.) (per curiam) (mem. op.); *Stroik v. Stroik*, No. 02-22-00060-CV, 2022 WL 2979172, at *1 (Tex. App.—Fort Worth July 28, 2022, no

stay order in the mandamus proceeding (before we issued it), she did not challenge that order in the appeals until she filed her brief in No. 02-21-00420-CV. And in that brief she did not seek to have this court or the trial court fix an adequate security;[11] instead, she sought only the dissolution of our stay order.[12]

The day we issued the stay, Husband filed a motion to consolidate the separate receiver-appointment appeal and original proceeding, which we granted. Because the procedural issues for all three causes are intertwined, we are addressing them in one memorandum opinion. But we will address the property-division issues raised in No. 02-21-00408-CV first, not only for ease of discussion and context but also because a reversal of the property division could affect the receiver-appointment order.

---

pet.) (mem. op.); *Antolik v. Antolik*, 625 S.W.3d 530, 541–43 (Tex. App.—Texarkana 2021, pet. denied); *Est. of Williams*, No. 10-17-00406-CV, 2018 WL 5049499, at *1 & n.1 (Tex. App.—Waco Oct. 17, 2018, no pet.) (mem. op.) (citing cases and explaining why sale of property pursuant to unsuperseded receivership order mooted appeal of that order); *cf. L Series*, 571 S.W.3d at 878 ("Because an appealing party is typically entitled to supersedeas, the trial court generally cannot permit execution on an interlocutory order granting complete relief on a particular cause of action because to do so would destroy the nonprevailing party's supersedeas right.").

[11]*See* Tex. R. App. P. 24.3(a)(2), 24.4; *Abdullatif*, 536 S.W.3d at 50–56 (reviewing sufficiency of supersedeas set by trial court for nonmonetary part of judgment and ordering appellants to "post additional security").

[12]Although asserting that "[i]t is well established black letter law that orders appointing receivers are subject to the rules governing supersedeas," Wife nevertheless contends—contrary to the authority cited above—that the appeal of the receiver-appointment order would *not* be mooted if the receiver were to list and sell the home and distribute the sales proceeds while the appeal is pending.

11

## II. Tracing-Expert Complaint Not Preserved

In his first issue in No. 02-21-00408-CV, Husband complains about the trial court's exclusion of his tracing expert's testimony.

On the first day of trial, Wife sought to exclude the testimony of Husband's tracing expert, Michael Turner, for Husband's failure to timely respond to Wife's request for production seeking documentation relied on by Turner in forming his tracing opinion. *See* Tex. R. Civ. P. 215.2(b)(4). According to Wife, although Husband had designated Turner as an expert in his second supplemental response to her requests for disclosure, he had also stated at that time that Turner's "mental impressions that form the basis of his impression [were] still being developed" and that Turner "need[ed] more documents" before he could complete a report. Husband did not provide any documents related to Turner's proposed testimony until "23 hours before trial," when Husband's counsel emailed over 200 documents to Wife's counsel. Wife therefore objected to Turner's proposed testimony under civil procedure rules 194.2 and 195, as well as *Alvarado v. Farah Manufacturing Co.*, 830 S.W.2d 911, 914 (Tex. 1992) (op. on reh'g), and *Exxon Corp. v. West Texas Gathering Co.*, 868 S.W.2d 299, 304 (Tex. 1993).

After hearing Husband's response, the trial court sustained the objection. Husband's counsel asked to make an offer of proof, and the trial judge stated, "You may do that at a point when we take a recess." However, no record of an offer of proof was taken.

12

To preserve error in excluding evidence, a party must make an offer of proof unless the substance of the evidence is apparent from the context. Tex. R. Evid. 103(a)(2). "The primary purpose of an offer of proof is to enable the appellate court to determine whether the exclusion was erroneous and harmful. A secondary purpose is to permit the trial judge to reconsider his ruling in light of the actual evidence." *Emami v. Emami*, No. 02-21-00319-CV, 2022 WL 3273603, at *3 (Tex. App.—Fort Worth Aug. 11, 2022, no pet.) (mem. op.) (quoting *In re L.L.J.*, Nos. 02-14-00407-CV, 02-14-00408-CV, 2015 WL 5634111, at *1 (Tex. App.—Fort Worth Sept. 24, 2015, no pet.) (mem. op.)).

Here, the substance of Turner's proposed testimony was not apparent from the context. Thus, Husband was required to make an offer of proof on the record. Tex. R. Evid. 103(a)(2). Because he did not, Husband failed to preserve this complaint for appeal. *See Sink v. Sink*, 364 S.W.3d 340, 347 (Tex. App.—Dallas 2012, no pet.).

Husband also contends that the trial court abused its discretion by failing to grant a continuance to allow time for Wife to review Turner's report. But because Husband failed to file a written, verified motion for a continuance, we must conclude that the trial court did not abuse its discretion by denying one. *See* Tex. R. Civ. P. 251; *In re M.R.*, No. 02-22-00118-CV, 2022 WL 4545534, at *9 (Tex. App.—Fort Worth Sept. 29, 2022, no pet.) (mem. op.).

We overrule Husband's first issue.

## III. Property-Division Claims

Husband raises three property-division-related complaints in No. 02-21-00408-CV: (1) the trial court abused its discretion by denying his constructive fraud claim, (2) the trial court abused its discretion by determining that the 50/305th interest in the India Property is community property, and (3) the trial court abused its discretion by determining that the community property could not be partitioned in kind.

### A. General family-law standard of review

We review a just-and-right division for an abuse of discretion, which in family-law cases includes considering legal and factual sufficiency as relevant factors. *Rice v. Rice*, No. 02-21-00413-CV, 2023 WL 109817, at *8 (Tex. App.—Fort Worth Jan. 5, 2023, no pet. h.) (mem. op.). In doing so, we must determine (1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether the trial court erred in its application of that discretion. *Id.*

In determining the first question, we apply the same standards of review to a trial court's findings of fact that we apply to a jury's answers to questions in the court's charge. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). Evidence is legally insufficient to support a finding only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining legal

sufficiency, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

When a party attacks the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof, the party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Cath. Diocese of El Paso v. Porter*, 622 S.W.3d 824, 834 (Tex. 2021). In reviewing such a challenge, we must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). If no evidence supports the finding, then we will examine the entire record to determine if the contrary position is established as a matter of law. *Id.* The evidence is legally insufficient to support the finding only if the contrary position is conclusively established. *Id.* Evidence conclusively establishes a fact when the evidence leaves "no room for ordinary minds to differ as to the conclusion to be drawn from it." *Int'l Bus. Mach. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019).

15

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). When the party with the burden of proof appeals from a failure to find, the party must show that the failure to find is against the great weight and preponderance of the credible evidence. *Dow Chem. Co.*, 46 S.W.3d at 242; *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988); *see Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681–82 (Tex. 2006).

## B. Husband's fraud claim

In his fourth issue,[13] Husband claims that the trial court abused its discretion by denying his fraud claim "when the evidence was legally and factually sufficient to establish that Wife wasted community funds."[14]

---

[13]We address his issues out of order for ease of discussion.

[14]Although Husband references only factual sufficiency in the argument part of his brief on this issue, we will review both in light of the way he worded his statement of this issue.

## 1. Applicable law

The Fourteenth Court of Appeals has explained the concept of fraud on the community marital estate:

> A fiduciary duty exists between a husband and a wife as to the community property controlled by each spouse. The breach of a legal or equitable duty that violates this fiduciary relationship is called a fraud on the community, a judicially-created concept based on the theory of constructive fraud. Fraud on the community, although not actually fraudulent, has all of the consequences and legal effects of actual fraud because it tends to deceive the other spouse or violates confidences that exist as a result of the marriage. Waste is one form of fraud on the community. Waste occurs when a spouse, without the other spouse's knowledge or consent, wrongfully depletes the marital estate of community assets. The Supreme Court of Texas has recognized waste of community assets as a factor a trial court should consider when dividing a community estate.
>
> A presumption of waste arises when one spouse disposes of the other's interest in community property without the other spouse's knowledge or consent. In that circumstance, the burden of proof to show fairness in disposing of the community asset is placed on the disposing spouse. A waste finding can be supported by evidence that a spouse used excessive funds without the other spouse's consent. . . . Waste claims can be premised not only on specific transfers or gifts of community assets to a third party, but also on evidence of community funds unaccounted for by the spouse in control of those funds.

*In re Marriage of Walzel*, No. 14-16-00637-CV, 2018 WL 614767, at *3 (Tex. App.—Houston [14th Dist.] Jan. 30, 2018, no pet.) (mem. op.) (citations omitted). No dishonesty of purpose or intent to deceive must be established; such proof of subjective intent is required only to prove actual fraud on the community, as opposed to constructive fraud on the community. *Miller v. Miller*, No. 14-17-00293-CV, 2018

17

WL 3151241, at *5 (Tex. App.—Houston [14th Dist.] June 28, 2018, no pet.) (mem. op.).

After the presumption of waste has been established, the court is to consider three primary factors in determining fairness: (1) the disposed property's size compared to the community estate's total size; (2) the estate's adequacy to support the other spouse after the disposition; and (3) the relationship of the parties involved in the transaction or, in the case of a gift, of the donor to the donee. *Puntarelli v. Peterson*, 405 S.W.3d 131, 138 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Upon determining that a spouse has committed fraud on the community, the trial court must reconstitute the community estate by, before making its just-and-right division, calculating "the value by which the community estate was depleted as a result of the fraud on the community and . . . the amount of the reconstituted estate," which is "the total value of the community estate that would exist if . . . fraud on the community had not occurred." Tex. Fam. Code Ann. § 7.009(a)–(b); *see also id.* § 7.009(c); *Puntarelli*, 405 S.W.3d at 138 ("A claim for the improper depletion of the community estate may be resolved by the trial court with an unequal division of the community estate, or a money judgment in order to achieve an equitable division of the estate.").

### 2. Application to facts

The trial court here found that Husband did not prove that Wife had "wrongfully depleted or spent [Husband's] one-half interest in any community funds

18

or assets without [his] knowledge or consent or that [she had] wrongfully depleted or spent any community funds or assets." According to Husband, this finding is manifestly unjust and against the evidence's great weight and preponderance. Citing specific pages in the appellate record, he points to the following evidence of funds that he alleged Wife spent without his knowledge or consent:

- The trial court admitted into evidence Wife's bank statements that included multiple accounts in America and India and copies of checks Wife wrote. . . .

- Husband testified that "there was a significant amount of money that was unaccounted for" by Wife. . . .

- Wife withdrew approximately $90,000 from various financial accounts over the course of two years. . . .

- Wife made several international wire transfers to various accounts. . . .

- Funds were transferred to jewelry stores and Wife's family members. . . .

- Wife wrote four checks totaling $50,000 to a family member. . . .

Husband contends that this evidence was sufficient to raise the presumption of waste and thus shift the burden to Wife to prove that she disposed of these funds fairly.

Both Husband and Wife testified that they never had a joint banking account.

Husband offered, and the trial court admitted, sixty-five exhibits consisting of Wife's bank records from January 2007 through August 2021. He questioned Wife specifically about only five of them, and he testified only generally about them as a group: he gave as "examples"—without referring to any specific statement—(1) the

"unusual number and amounts of cash withdrawals, specifically . . . since filing for the divorce, including the day the contract was signed"; (2) the "unusual number and amount and frequency of withdrawals from the child support debit card, including three or four withdrawals from the same ATM, same day, same time frame"; and (3) "some fraudulent checks written" by Wife. According to Husband, "all of it, total, amounts to a little more than $300,000.00," with "[r]oughly, ninety -- eighty, $90,000.00" being cash withdrawals made between March 2019 and August 2021.[15]

Husband denied ever having access to any of Wife's bank accounts. He testified that Wife had transferred funds from her U.S. bank account to an Indian bank account in her name and that those funds were then either withdrawn by her parents, paid to jewelry stores, or transferred to the seller of the India Property, which Husband and Wife had joined with her family to purchase. He also testified that Wife wrote four checks totaling about $50,000 to her cousin in Austin. According to Husband, during the marriage, he paid for "all the big ticket items, like the mortgage,

---

[15]Although Husband introduced this evidence in an attempt to show excessive, unaccounted-for spending by Wife, the only reconstitution of the estate that he requested was $25,000 for her or her family's alleged fraud in obtaining that amount for the India Property investment but not using it for that purpose. Husband does not raise that complaint on appeal. Nevertheless, because he raised the waste issue at trial in relation to Wife's checks and cash withdrawals, we will review the complaint as presented.

the car, the shopping, the clothes, the furniture," and Wife took "care of the kids' activities and . . . groceries."[16]

Wife, on the other hand, testified that Husband "mostly" or "exclusively" handled the finances in the marriage and that he "always had access to all the bank statements, including [hers] or his or everything."[17] Husband regularly logged in and checked all of their accounts, including hers, and he balanced all of the accounts on a monthly basis. She did not change the passwords to her accounts until she moved out of the house in July or August 2019. After their separation, she personally maintained her own accounts.

Wife also testified that (1) in 2012, the couple had agreed to purchase jewelry for her and for her niece and (2) in 2017, the couple had mutually spent thousands of dollars on her daughter's voni ceremony,[18] much of which included transferring funds

---

[16]Wife's bank records and the parties' filings show that—before their separation and on a monthly basis—she also paid for utilities, insurance, and cell-phone expenses.

[17]Wife testified that Husband was controlling about money, particularly what she charged to credit cards; that she was the frugal one; and that she had stopped complaining about money because he told her their finances were his responsibility and that she didn't need to worry about them.

[18]Wife explained that in their culture a voni is a coming-of-age ceremony for young women, akin to a Sweet 16 or quinceañera. It involves a large ceremony and reception as well as gift-giving.

to India or to family members to purchase specific items, including jewelry.[19] Husband appeared to concede during cross-examination that he and Wife had used her India account to pay for jewelry, but he denied that they had transferred money to the account to pay for their personal expenses while visiting India. He also disputed Wife's testimony that they had mutually agreed to reimburse her family members for jewelry, testifying about the checks she wrote: "I couldn't understand the reason why. We don't owe them any money. If we want to buy jewelry, we have money."

From this contravening evidence, the trial court was entitled to believe that none of Wife's pre-separation expenditures were unexplained or made without Husband's knowledge or consent. *See Dow Chem. Co.*, 46 S.W.3d at 241. Thus, at least as to expenditures occurring before August 2019,[20] Husband did not produce evidence sufficient to shift the burden to Wife to prove that her expenditures up to

---

[19]Husband never identified an exhibit showing the $50,000 in checks he claimed Wife wrote to her family members. The record contains six exhibits containing copies of twenty-two checks, many of which appear to be for regular expenses or to non-family members. The following checks to family members were written before the parties' separation date: an October 27, 2017 $14,000 check and a January 3, 2018 $12,150 check to M.J.; and an October 27, 2017 $11,000 check to S.J. Wife testified that M.J.—her cousin's husband and Husband's friend—"actually went to the jewelers and made all the final payments" for jewelry for their daughter's voni ceremony and that she wrote reimbursement checks to him, his wife, and children "here in the US." The record also contains copies of an August 2017 $1,538 check to A.G., but no evidence directly explains that check's purpose.

[20]Wife's March 2019 statements from two separate checking accounts showed a $6,000 March 12, 2019 withdrawal and a March 21, 2019 $12,000 withdrawal. On March 12, 2019, she signed an engagement letter with her attorney and paid a $7,500 retainer fee from her checking account.

that time were fair; even if he had, however, the trial court was entitled to believe her specific testimony over Husband's general and conflicting testimony. *See Felix-Forbes v. Forbes*, No. 02-15-00121-CV, 2016 WL 3021829, at \*6 (Tex. App.—Fort Worth May 26, 2016, no pet.) (mem. op.).

Husband's exhibits pertinent to post-separation spending by Wife included Wife's checking and savings account statements for August through October 2019, December 2019, February through March 2020, June through August 2020, October through December 2020, and February 2021.[21] These show that in all but one of those months (December 2019), Wife made ATM or other unidentified withdrawals from between $500 to $2,000.

Husband's evidence also included an exhibit showing deposits and withdrawals from Wife's account into which Husband paid child support. No checks were written from the account; all withdrawals were made via ATM. Wife withdrew $5,635 from the account in October 2020,[22] $3,622.50 in January 2021, $830 in March 2021,

---

[21]The bank statements begin a few days before the end of the preceding month and end a few days before the last day of the month; therefore, we have identified them by the month containing the majority of dates and transactions. Several of the exhibits are duplicates.

[22]The evidence shows that in October 2020 Wife opened and began contributing to 529 college savings accounts for both children and that those accounts had a total balance of around $30,000 at the time of trial. Although the bank statements show that she made payments from her checking account to the holder of those accounts beginning in October 2020, no evidence shows that those payments were the exclusive means of funding that account. Husband not only did not object to the 529 accounts, but he also requested that they be included in Wife's assets in the

23

$1,207.50 in April 2021, $1,610 in May 2021, $1,610 in July 2021, and $3,220 in August 2021. Thus, in these seven months, Wife withdrew $17,735[23] from the child-support account.

Adding all of these withdrawals from August 2019 through August 2021, the evidence shows Wife withdrew $31,185: an average of $1,247.40 in cash per month during that 25-month period. By way of comparison, the two years of bank statements from June 2013 to May 2015—when Husband had access to Wife's account and, according to Wife, was solely responsible for balancing her accounts— show that during that two-year period Wife also routinely made ATM or other cash withdrawals from her accounts, ranging from $500 monthly to $6,000 or more.[24] The evidence shows that over that two-year period, Wife withdrew around $1,075.13 per month on average from her accounts, in addition to paying regular monthly expenses.

---

trial court's just-and-right division. *See, e.g.*, *Gupta v. Gupta*, No. 03-09-00018-CV, 2010 WL 2540487, at *4 (Tex. App.—Austin June 24, 2010, no pet.) (mem. op.) (holding any error harmless when in accordance with appellant's request to trial court). In the decree, the trial court awarded one of the accounts to Husband and the other to Wife.

[23]Wife's monthly expense worksheet admitted at trial without objection listed $1,550 per month for the children's school-lunch, lessons, activities, and miscellaneous expenses as well as $250 per month for clothes, which over six months would amount to $10,800.

[24]One of these statements shows a 2013 $10,500 transfer to a checking account number Wife that said she could not identify, and she denied that it was hers: "I can testify that [account number] is not an account I own or possess or have ever owned." She testified that because of Husband's control over and access to her account, he could have made that transfer. Nevertheless, the trial court was not required to credit Wife's testimony about the withdrawal.

Wife testified that she eschewed using a debit card to directly pay for certain expenses, preferring instead to use her debit card to withdraw cash, and that she had a history of doing so, having learned the habit from Husband. She also testified that her withdrawals from the child-support account were for "several reasons for" the "children's expenses." Although Husband was required to pay half of the expenses for the children's extracurricular activities, Wife testified that at least once he had refused to reimburse her for a $500 tuition payment for a summer class for their daughter, and with his refusal stated that he was paying child support, so "he [didn't] have to pay any additional costs."[25]

This testimony—along with (1) the other evidence that during the two-year period of separation Wife maintained a monthly average withdrawal amount commensurate with her prior spending pattern while at the same time paying significantly increased monthly living expenses[26] and over $77,000 in attorney's fees[27]

---

[25]Husband testified that he told her he would not pay her half of the tuition because she already owed him money for the children's out-of-pocket medical expenses.

[26]Sometime after February 2021 but before trial, Wife paid off the loan on her car.

[27]By way of comparison, the evidence showed that Husband withdrew $25,000 from one of his brokerage accounts in March 2021, which he testified was for paying attorney's fees. But his attorney's-fees statements for his divorce attorney do not show a payment in March 2021 and show only a $9,105.25 payment in April 2021. Nevertheless, the evidence shows that from February 2020 through the time of trial (a little over a year and a half), Husband paid at least $74,876.91 in attorney's fees.

and (2) Husband's admission that before their separation Wife had paid for the children's activities[28]—supports the trial court's decision that during their separation Wife did not waste the community's assets by withdrawing excessive funds from her accounts without Husband's consent.[29] We therefore hold that the trial court did not abuse its discretion, and we overrule Husband's fourth issue.

## C. India Property

In his third issue, Husband challenges the sufficiency of the evidence to prove that a 50/305th interest in the India Property was his separate property; he contends the clear and convincing evidence conclusively showed that "he invested in the India [P]roperty using his separate property funds." Although in his specific, post-trial objections to the trial court's proposed decree and to its findings of fact Husband omitted an objection to the characterization of the India Property as community

---

[28]Husband testified, "I've been buying clothes and shoes and all the stuff for [the] kids."

[29]The record also contains copies of checks Wife wrote to family members after the parties' separation: a $3,000 check to H.G. for "Graduation"; and a $3,116 check to A.G. for "Panchalu (Dhoti)." Even if Husband raised the presumption that Wife wasted these funds at the community estate's expense, the trial court would not have abused its discretion by determining—based on the fairness factors—that Husband was not entitled to a reconstitution of the community estate for $6,116. *See, e.g.*, *Mazique v. Mazique*, 742 S.W.2d 805, 808 (Tex. App.—Houston [1st Dist.] 1987, no writ) (noting that managing spouse may make "moderate gifts for just causes to persons outside the community" so long as they are not "capricious, excessive, or arbitrary").

property,[30] because he clearly raised the issue at trial and because he was not required to raise this complaint in a motion for new trial, we will review it. *See* Tex. R. Civ. P. 324.

### 1. Applicable law

In Texas, property owned before marriage—or acquired during marriage by gift, devise, or descent—is separate property and remains the spouse's separate property during and after the marriage. Tex. Const. art XVI, § 15; Tex. Fam. Code Ann. § 3.001. A trial court has no discretion to divest a party of his or her separate property via a divorce decree. *Vickery v. Vickery*, 999 S.W.2d 342, 371 (Tex. 1999) (op. on reh'g); *Alcedo v. Alcedo*, No. 02-17-00451-CV, 2019 WL 2292979, at *3 (Tex. App.—Fort Worth May 30, 2019, pet. denied) (mem. op.).

But as a starting point for a division, "[p]roperty possessed by either spouse during or on dissolution of marriage is presumed to be community property." Tex. Fam. Code Ann. § 3.003(a). Therefore, a party claiming certain property as separate has the burden to rebut the community property presumption. *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011). To do so, the party must trace and clearly identify the property in question as separate by clear and convincing evidence. *Id.* "We determine whether property is separate or community by its character at the time of inception." *In re Marriage of Nash*, 644 S.W.3d 683, 696 (Tex. App.—Texarkana 2022, no pet.).

_____

[30]Husband objected only "on the grounds that the property is outside the jurisdiction of the Court and the order is not specific enough for enforcement" and that "the Court received inadequate testimony to determine a proper division, if any."

Although property separate at inception "may go through a series of exchanges, it will retain its separate character if the party can trace the assets on hand during the marriage to property that was separate when first acquired." *Id.* Thus, even if an account contains both community and separate funds, the separate funds do not lose their character if they can be traced so that the trial court can determine each party's interest accurately. *Id.* at 697 (noting that tracing may sometimes be difficult but nevertheless possible because "[c]ourts have no difficulty in following separate funds through bank accounts"). "The only requirement for tracing . . . is that the party attempting to overcome the community presumption produce clear evidence of the transactions affecting the commingled account." *In re Marriage of Guerra*, No. 13-21-00377-CV, 2022 WL 16842086, at *3 (Tex. App.—Corpus Christi–Edinburg Nov. 10, 2022, no pet.) (mem. op. on reh'g) (quoting *Welder v. Welder*, 794 S.W.2d 420, 434 (Tex. App.—Corpus Christi–Edinburg 1990, no writ)). When separate and community property are commingled in a single bank account, we presume the community funds are drawn out first. *In re M.H.*, No. 05-19-00133-CV, 2020 WL 5104965, at *7 (Tex. App.—Dallas Aug. 31, 2020, pet. denied) (mem. op.).

Mere testimony that property was purchased with separate property funds, without tracing those funds, is generally insufficient to rebut the community property presumption. *Id.* at *6. "[I]f separate property and community property have been so commingled as to defy resegregation and identification, the statutory presumption of community property prevails." *Nash*, 644 S.W.3d at 697 (quoting *In re Marriage of Born*,

28

No. 06-08-00066-CV, 2009 WL 1010876, at *2 (Tex. App.—Texarkana Apr. 16, 2009, no pet.) (mem. op.)). Additionally, account-statement gaps can render tracing evidence less than clear and convincing. *Eichorn v. Eichorn*, No. 03-20-00382-CV, 2022 WL 1591709, at *4 (Tex. App.—Austin May 20, 2022, no pet.) (mem. op.). Any doubt about the character of property should be resolved in favor of the community estate. *M.H.*, 2020 WL 5104965, at *6.

In other words, when a trial court can only speculate, "based on testimony and spotty records," what part of an account is separate and what part is community, the community presumption must prevail. *Nash*, 644 S.W.3d at 698.

### 2. Application to facts

Husband claimed the India Property as his separate property in the asset spreadsheet he presented to the trial court. Wife, on the other hand, did not include the India Property in her inventory and appraisement or request for relief.

Wife testified that the India Property was purchased in 2006 with a group of investors—Husband, her cousins, other family members, and acquaintances—and that the purchasers decided "to put this land on [her] mother's name." She warned Husband then that neither of her parents are business savvy and that her father had always made bad investments. Nevertheless, she told Husband that she would support him if he wanted to go through with the group investment. According to Wife, Husband "was the one on conference calls with investors, and he very well knew what

29

he was investing in. [She] was pregnant . . . at the time, so he was taking care of all of th[ose] matters."

She characterized the property purchase as a bad investment because (1) the investors couldn't get clear ownership to one of the three acres and (2) the agricultural land was purchased with the intent to develop it commercially but the surrounding city had not grown like the investors thought it would; therefore, they couldn't sell the property after buying it. When asked whether the property had "greatly increased in value," she answered, "Not that I am aware of."

When asked how they purchased their interest in the property, Wife said that Husband made one payment from his bank account and she made another payment from hers. She denied that the money to purchase the property was intended as a gift to her parents.

Husband provided bank statements showing that on December 18, 2006, he sent a $90,000 wire transfer from the savings account that he had owned before the parties' April 2006 marriage to Wife's bank account in India, which according to Husband "is also operated by her parents." Husband testified that the funds were "for the purpose of investment in the" India Property. According to Husband, the investment was Wife's father's idea, and although Husband was hesitant to make the investment, Wife influenced him to do so.[31] Husband confirmed that the land

---

[31]Husband contended in the trial court that the transaction was fraudulent, but he has not appealed the trial court's no-fraud finding in relation to the India Property.

30

purchase was intended for commercial development, but he also testified that he was under the impression that all of the money he had sent was for the land purchase only, not any development costs. According to Husband, his impression turned out to be untrue because all of the land was purchased in March 2007 for a price much lower than the total he had been told.[32]

Husband testified that the account from which the $90,000 was transferred was the account into which his paychecks were deposited and from which he paid bills.

The evidence specific to Husband's bank account shows that on April 28, 2006, the combined balance in Husband's checking and savings accounts was $92,587.38, $88,287.16 of which was in his savings account. The marriage occurred on April 30, 2006; thereafter, Husband's paychecks were deposited into his checking account. From May through December 2006, Husband transferred money from his savings account to his checking account and vice versa. By December 2006, he had transferred $10,876.25 more from his checking account to his savings account than he had transferred from his savings to his checking account. Thus, when Husband transferred the $90,000 from his savings account to Wife's India account, he had already commingled community and separate funds in his savings account.

Even if we were to apply the principle that the $90,000 transfer consisted of $10,876.25 of community property paid out first and $79,123.75 of Husband's

_____

[32]Husband offered, and the trial court admitted, three deeds dated March 2007. According to Husband, he invested another $30,000 in the property "[o]ver a period of time," including $25,000 in 2007.

separate property, Husband did not provide any evidence from which we could trace what happened to that money when and after it was deposited in Wife's India account—an account to which not only Wife but also her parents had access. Husband did not present evidence of how much money was in the India bank account in December 2006 before his transfer of funds, the total transferred from the India bank account for the land purchase and to whom, and when that transfer of funds occurred. He also does not account for the payment Wife testified that she made from her U.S. account for the purchase of the India Property. Although the records from Wife's India account show three separate transfers of rupees to a person identified as Gopinath[33]—one in January 2007 for 1,500,000 rupees[34] and two more in April 2007 for 350,000 rupees each—the deeds show three purchases for 1,500,000 rupees each. Thus, even if—as Husband testified—the entire amount of his $90,000 transfer did not get used to actually purchase the India Property, his community property funds would have been the first expended on that purchase. However, because of the subsequent gaps in the transferee account statements, we cannot trace how much of Husband's separate property, if any, was used to purchase the India Property. *See Guerra*, 2022 WL 16842086, at \*3; *Eichorn*, 2022 WL 1591709, at \*6–7.

---

[33]A 2016 email admitted into evidence states that Gopinath Nadu is the "Real Estate broker[] who sold the land."

[34]The account statements use the currency code for rupees, INR. *See* 1 Trademarks Throughout the World § 74:1 (Jan. 2023). Husband failed to present any evidence of the then-current exchange rate from U.S. dollars to rupees.

Thus, Husband failed to conclusively prove that any part of the India Property was purchased with his separate property funds and therefore owned by him as separate property. We overrule his third issue.

## D. Community property not subject to partition in kind

In his second issue, Husband contends that the evidence was legally and factually insufficient to support the trial court's findings that the marital residence was not subject to an in-kind division. Husband argues that the trial court should have awarded Wife a money judgment for her share of the home's equity instead of ordering that the property be sold.

### 1. Applicable law

The general rule of property division in a divorce is that the division must be "just and right, having due regard for the rights of each party and any children of the marriage." Tex. Fam. Code Ann. § 7.001. In making the just-and-right division, the trial court must initially determine if the community estate is subject to partition in kind. *Hailey v. Hailey*, 331 S.W.2d 299, 303 (Tex. 1960); *Samaniego v. Samaniego*, No. 04-13-00519-CV, 2014 WL 2917457, at *5 (Tex. App.—San Antonio June 25, 2014, pet. denied) (mem. op.). An in-kind property division contemplates the trial court's awarding individual items of property to each person so that the overall division is just and right. *Walston v. Walston*, 971 S.W.2d 687, 693 (Tex. App.—Waco 1998, pet. denied).

33

"In determining if property is subject to division in kind[,] the trial court should consider the 'nature and type of [the] particular property involved and the relative conditions, circumstances, capabilities[,] and experience of the parties.'" *Id.* at 693 (quoting *In re Marriage of Jackson,* 506 S.W.2d 261, 266 (Tex. App.—Amarillo 1974, writ dism'd) (op. on reh'g)). If the property is subject to partition in kind, the trial court must equitably divide the property; if it is not, then the trial court may award a money judgment to one party and community assets to the other party or appoint a receiver to sell the property. *Samaniego,* 2014 WL 2917457, at *5; *Adkison v. Adkison,* No. 12-06-00077-CV, 2007 WL 259550, at *6 (Tex. App.—Tyler Jan. 31, 2007, no pet.) (mem. op.); *Rusk v. Rusk,* 5 S.W.3d 299, 306–07 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); *Vannerson v. Vannerson,* 857 S.W.2d 659, 672 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (noting that "[i]n divorce proceedings, if the homestead cannot be partitioned, it is subject to sale and a division of the proceeds"). In determining whether to award a money judgment to one party and community assets to the other party, the trial court should consider the same factors it must consider when deciding whether property is subject to partition in kind. *Walston,* 971 S.W.2d at 693 (first citing *Finch v. Finch,* 825 S.W.2d 218, 224 (Tex. App.—Houston [1st Dist.] 1992, no writ); and then *Hanson v. Hanson,* 672 S.W.2d 274, 278 (Tex. App.—Houston [14th Dist.] 1984, writ dism'd)).

## 2. Application to facts

The trial court here was able to award each party an almost 50% share of personal property, thus leaving only the real-property interests to be divided.[35] Commensurate with the 50/50 personal-property division, the trial court awarded each party 50% of whatever ownership interest the community held in the India Property (claimed to be a 50/305th interest) as well as 50% of the net proceeds from the home's sale. Thus, the property division evidenced the trial court's intent to divide the entire marital estate as close to 50/50 as possible.

When the parties separated and modified temporary orders were rendered in August 2019, Wife moved out of the marital residence and into a rental home, and Husband continued to live in the marital residence pending the divorce. He continued paying the mortgage as he had previously done, but he also assumed liability for the utilities and upkeep. Nevertheless, Wife remained a debtor on the mortgage.

Wife testified about why she was seeking to have the home sold instead of having the trial court award it to Husband:

> I'm on the mortgage of the home, and it's been hard for me to rent a home. I want to buy a home for my children. Last two years -- in fact, I've extended the lease two times now. It's been a struggle. My landlord increased the rent by $800.00 just this past July, and I tried to move out and I couldn't find another home that I could afford, and it is very hard for me to keep bouncing around with the kids from home to home to home or pay exorbitant rent based on the landlord's whims. I would rather buy a small home and move on. And I can't be on two homes'

---

[35]Although Husband had proposed a 50/50 division, Wife had sought an unequal division of 56/44.

> mortgages. I work for a mortgage company, and I can't be qualified for a second mortgage if I'm on this first mortgage.

Wife needed her share of the equity from the marital residence to be able to purchase a home of her own, and she did not think Husband had the ability to pay it to her.

Husband denied knowing whether the trial judge could order the mortgage company to remove Wife as a debtor so that she could obtain a mortgage on a new home in her own name. His "understanding" was that "the attorneys will help the process and prepare some documents to get her released, and in some cases, maybe some refinancing needs to be done with just [him] based on [his] credit strength." Husband agreed, however, that it would be better if Wife were no longer encumbered by the mortgage debt.

Husband wanted to continue to live in the home because "[t]here's a lot of sentimental attachment" and the children loved the home. He testified that he thought Wife could obtain her equity in the home from an award of other property from the community estate; in his words, "[t]hat should be part of the comprehensive arrangement, not piecemeal." But when asked, "How are you going to pay her her portion of the equity," Husband answered, "I don't have an answer for piecemeal."

According to Wife, she had several problems getting her own appraisal while the divorce was pending because even though Husband had obtained his own appraisal, Husband refused to respond to her appraiser's attempts to contact him so that he could inspect the home. Husband denied that he had failed to respond: "I

36

don't recollect him leaving any voicemail and I couldn't recognize the number." He also attempted to blame the delay on his former attorneys, saying that their strategy was to cooperate only after Wife had corrected what Husband called "pending discovery deficiencies." Wife eventually had to file a motion for appraisal, which the trial court granted. Wife also testified to other incidences of Husband's refusal to cooperate. For example, he refused to give her a sofa that the trial court had ordered to be given to her in the temporary orders. Husband admitted that he had not complied with the trial court's order to give her the sofa.

Wife was concerned about Husband's keeping the home clean and presentable for sale based on his recalcitrance over the appraisal. Also, according to Wife, "[H]e identifies himself more with the house than anything else, and I feel he would go to any extent not to sell the house, and I really need help from the Court to be able to sell the house."

Husband and Wife disagreed on the home's net equity: he valued it at $406,622, and she valued it at $670,622. Both parties offered supporting appraisals as evidence; Wife's was dated June 29, 2021, and Husband's was dated September 29, 2020. Wife's appraisal relied on six comparable sales from August 2020 through April 2021; Husband's relied on only three comparable sales that had occurred in January, April, and June 2020. Husband's appraiser testified and admitted that she would have to do more research to determine if the home's value had changed as of the October 2021 trial date. Husband testified about why he thought the home should be valued lower

than Wife's appraised value; he believed her appraiser (1) had failed to take into account that the home had been built by a "mass builder" instead of a custom builder; (2) had valued unfinished storage space that did not have HVAC; (3) had failed to consider structural damage; (4) and had not taken into account that the roof and carpets needed to be replaced, that some of the landscaping had died in the 2021 winter storm, and that the drive gate needed to be replaced.[36] Nevertheless, the trial court was entitled to put more weight on Wife's appraisal evidence and thus conclude that dividing the equity 50/50 would result in an award of $335,311 to each spouse.

Although Husband did not request a money judgment at trial, he contends on appeal that the trial court should have ordered him to pay a money judgment for Wife's half of the home's equity rather than order the home sold and the net proceeds split 50/50.[37] He also appears to argue that the trial court could have awarded Wife other assets to account for her half of the home's equity.

---

[36]Wife's appraiser had noted, "Physical depreciation is minimal" and "No functional or external obsolescence was noted."

[37]Because the approximately half-acre residential property consists mostly of an approximately 5,500-square-foot, two-story home, there was no evidence presented that the property itself could be partitioned in kind in the traditional sense. *See Bowman v. Stephens*, 569 S.W.3d 210, 220 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (noting that partition in kind between joint owners means "that property is divided into separate parcels and each parcel is allotted to a separate owner"); *Beago v. Ceres*, 619 S.W.2d 293, 294–95 (Tex. App.—Houston [1st Dist.] 1981, no writ); *see also S.C. v. M.B.*, 650 S.W.3d 428, 434 (Tex. 2022) ("A Property Code partition presumes an even split; in a divorce, by contrast, a judge uses a 'just and right' standard to divide community property."); *Walston*, 971 S.W.2d at 693 ("[I]t is clear that an in-kind division of personal property [for purposes of dividing the community estate] does

But here, there were not enough liquid, nonretirement[38] assets available to award a lump-sum money judgment for Wife's equity half and still maintain the near 50/50 division. And the evidence supports a conclusion that not only was Husband not prepared to pay a money judgment over time—"I don't have an answer for piecemeal"—but also that Wife's immediate need for a down payment on a new home would not have been served by such a money judgment.

Based on the foregoing conflicting evidence, we conclude that the record supports the trial court's finding that the marital estate was not subject to a partition in kind such that the home could have been awarded to Husband and a just-and-right division still be effected. We thus overrule Husband's second issue related to the property division.

## IV. Receiver-Appointment Complaints

### A. Order is appealable

Husband complains about the receiver-appointment order in Nos. 02-21-00420-CV and 02-22-00010-CV, arguing in his first and second issues in each that (1) he is not sure what procedural vehicle is proper for challenging that order because he cannot tell under what authority the trial court purported to issue the order in the

---

not require cutting each item of property in half, but rather contemplates the trial court awarding individual items of personal property to each party such that the overall division of community property is 'just and right.'").

[38]Husband testified that he has significant health problems, a fact the trial court was entitled to consider in declining to invade Husband's retirement accounts to award him the house.

first place and (2) there is no authority to support the order.[39] According to Husband, only four sources of authority exist for appointing a receiver in this case—in a temporary order during the divorce, in a temporary order pending appeal of the divorce,[40] in the final decree itself, and in a post-divorce Chapter 9 enforcement proceeding—and because the trial court's order here was not issued under one of these four methods, it was issued without authority. Contrary to Husband's arguments, we conclude (1) that the trial court's order was issued as part of the final decree, albeit conditionally, pursuant to Texas Supreme Court authority, and (2) that we have jurisdiction to consider the order as an appeal from the final decree.

In *Hailey*, the Texas Supreme Court held that in the context of making a just-and-right division, after determining that property is not subject to partition in kind,

---

[39]However, Husband asks that if we determine that his issues are appealable in the appeal from the final decree (No. 02-21-00408-CV), we consider his issues in that appeal number. Because we are considering all of his issues in the context of a single opinion, we need not specify in which of the two appeal numbers we are addressing them.

[40]That a sale of the home would moot Husband's complaint about that part of the decree's property division shows why it was not a temporary order pending appeal; the trial court appointed a receiver to sell the home, not to preserve it in marketable condition pending appeal. *Cf.* Tex. Fam. Code Ann. § 6.709(a)(3) (authorizing trial court to appoint receiver pending appeal "for the preservation and protection of the property of the parties"); *In re Garza*, 153 S.W.3d 97, 100 (Tex. App.—San Antonio 2004, orig. proceeding) (addressing temporary order pending appeal that required husband to deposit payment into court's registry for wife's equity interest in home that had been awarded to her in decree); *Jones v. Jones*, 211 S.W.2d 269, 271, 274 (Tex. App.—El Paso 1944, no writ) (affirming appointment of receiver to "take charge of," rather than dispose of, properties pending appeal).

40

the trial court can appoint a receiver and order so much of the property as is incapable of partition to be sold and the proceeds divided between the parties in such portions as, in the discretion of the court, may be a just, fair[,] and equitable partition, having in mind the rights of the parties and the children.

331 S.W.2d at 303; *Rusk*, 5 S.W.3d at 307–08 (explaining difference between appointment of receiver pursuant to Family Code Section 7.001 and appointment of receiver under other authority); *cf. Allen v. Allen*, No. 02-17-00031-CV, 2018 WL 547586, at *6 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.) (holding that trial court with authority to order partition by sale of jointly owned separate property also had authority to appoint receiver to accomplish that sale). Although Husband argues that the trial court's order could not have been issued pursuant to *Hailey* because it was issued after the trial court signed the final decree,[41] the trial court's receiver-appointment order here merely effected—and thus went along with—what the trial court had conditionally ordered in the judgment.[42] Contrary to Husband's assertion—which lacks supporting citations—that no authority exists for such a conditional order, appellate courts have addressed such conditional final-decree receiver orders in appeals from the final decree. *See Nelson v. Nelson*, 193 S.W.3d 624,

---

[41]Husband argues that the receiver-appointment order was untethered to the decree, calling it "a stand-alone order independent of any live pleading, hearing, or trial."

[42]Husband argues, "[H]ad the parties listed the home for sale before the date certain, the trial court would have had no authority to appoint a receiver." Assuming that statement is true, it is true because of the trial court's own judgment language, not because of a lack of precedent authorizing such an order.

41

629–30 (Tex. App.—Eastland 2006, no pet.); *Walston*, 971 S.W.2d at 692–93; *Young v. Young*, 765 S.W.2d 440, 444 (Tex. App.—Dallas 1988, no writ); *Whitehill v. Whitehill*, 628 S.W.2d 148, 149–51 (Tex. App.—Houston [14th Dist.] 1982, no writ); *cf. Waters-Pierce Oil Co. v. State*, 106 S.W. 326, 328–29 (Tex. 1907) ("The order appointing the receiver, although made subsequently to the date of the judgment, but at the same term, might have been reviewed in the appeal of the principal case. The parties have treated this as a separate proceeding . . . and that [the] court [of appeals] has passed upon it as a separate and distinct case from the main suit . . . cannot deprive appellant of the benefit of a review of the order."); *Shulte v. Hoffman*, 18 Tex. 678, 682 (1857) (reviewing postjudgment receiver appointment in connection with review of denial of postjudgment motion and holding that trial court did not err by appointing receiver to effectuate the decree).

A judgment may still be final even "though further proceedings may be necessary in the execution of it or some incidental or dependent matter may still remain to be settled." *Hinde v. Hinde*, 701 S.W.2d 637, 639 (Tex. 1985). Here, the trial judge had determined after hearing the trial evidence that a partition in kind of the residence's value could not be effected and that the appointment of a receiver under *Hailey* was warranted, but he nevertheless first gave the parties the opportunity to, by agreement, foreclose the necessity of the receiver's appointment.[43] Because they did

---

[43]Finding of fact number 12(i)—the only finding Husband specifically challenges in his arguments against the receiver's appointment—provides, "Sufficient

42

not do so, the receiver-appointment order contemplated by and conditionally ordered in the final judgment itself issued.[44] Thus, we conclude that Husband's challenge to the receiver-appointment order is reviewable by direct appeal. *See Nelson*, 193 S.W.3d at 629–30; *Walston*, 971 S.W.2d at 692–93; *Young*, 765 S.W.2d at 444; *Whitehill*, 628 S.W.2d at 149–51. We overrule his first two issues in appeal number 02-21-00420-CV, and we deny his mandamus petition.

## B. Trial court did not abuse discretion

In his third issue challenging the receiver-appointment order, Husband contends that the trial court violated his due process rights by appointing a receiver without sufficient prior notice and the opportunity to be heard. He also argues within this issue that no evidence supports the order. Husband's due process complaints rest

---

evidence was presented to prove that [Husband] had a history of refusing to cooperate with [Wife] in regard to the home[;] thus[,] appointment of a receiver as a contingency was appropriate to take control of the sale of the property if the parties could not reach an agreement on a realtor, listing price[,] or sale price." In other words, the trial court had already determined from the trial evidence that the house would be sold and the net proceeds divided equally, but—considering the $264,000 gap between the parties' proposed home values urged at trial—was first giving the parties a chance to agree on mutually acceptable terms of sale before taking those decisions out of their hands.

[44]Husband argues that although a trial court is authorized to appoint a receiver in a final decree, it has no "authority to enter an order post final decree appointing a receiver unless the enforcement procedures set forth in Chapter 9 are followed." In addition to citing authority noting those cases in which trial courts have done so, we also note that Chapter 9 is not exclusive. *See generally S.C.*, 650 S.W.3d at 436–52 (reciting law that, absent compelling evidence of legislative intent, we do not presume statutes to limit a district court's jurisdiction and holding that the procedure outlined in Subchapter C of Family Code Chapter 9 is not the exclusive method of dividing property that was not addressed in original, final divorce decree).

on the erroneous presumption that the receiver-appointment order resulted solely from postjudgment proceedings and ignores that the proper disposition of the marital residence was not only raised pretrial but also was argued throughout the trial.

## 1. Notice and opportunity to be heard

Taking into account all of the particular circumstances, due process requires notice reasonably calculated to apprise interested parties of the action pending and to give them the opportunity to object. *T.L. v. Cook Children's Med. Ctr.*, 607 S.W.3d 9, 83 (Tex. App.—Fort Worth 2020, pet. denied). Whether notice is constitutionally adequate depends on the case's nature. *Id.* Thus, when an action or decision requires the trial court to evaluate evidence, "reasonable notice and a meaningful opportunity to be heard require that interested parties be permitted time to obtain and present witnesses and documentary evidence in support of their interests, as well as an opportunity to cross-examine and rebut witnesses and documentary evidence adverse to their interests." *Id.* at 83–84.

Here, beginning in late June 2019—in a motion to modify temporary orders—Wife sought an immediate sale of the home, with "the net proceeds . . . placed in [her] attorney's trust account."[45] In a later filed counterpetition for divorce and motion to modify the temporary orders, Husband asked to be awarded "the exclusive use and possession of the residence . . . while th[e] case [was] pending." The modified

---

[45]She asked for the relief again in her amended motion to modify the temporary orders, filed in August 2019.

temporary orders gave Husband "exclusive and private use and possession of . . . [t]he marital residence" but only "while th[e] case [was] pending."

In May 2021, after the mediation at which the parties agreed on provisions related to the children, Wife moved for an order requiring Husband to allow her appraiser access to the residence. In that motion, she explained that the mediation had failed as to property-division issues "largely in part [because of] the inability of the parties to agree on the value of the community property, [the] marital home." After the trial court ordered that Wife's appraiser be allowed to access the home, Wife filed her amended divorce petition, in which she again asked the trial court to order the property sold as part of any just-and-right division. Husband filed a general denial.

At trial, Wife testified about her desire that the house be sold and the net proceeds divided while Husband testified that he wanted to continue to live in the home after the divorce. And in Wife's Exhibit 3—a list of her proposed relief that the trial court admitted without objection—Wife repeated her desire that the marital residence be sold and also asked specifically that, upon any party's application, the trial court appoint a receiver if she and Husband could not agree on a sale price.

After trial and the trial court's initial letter ruling, Husband objected to a receiver appointment but not on due process grounds. Instead, Husband argued that (1) no evidence was produced at trial that the community estate was in danger of suffering irreparable loss, or that there is no adequate remedy at law for any loss if a receiver were not appointed and (2) the letter ruling did not include findings of fact or

conclusions of law to support the appointment. Husband also argued that the appointment was a "harsh remedy" that would damage the community estate's value. He reiterated those objections in his objection to Wife's proposed form of a final decree.

The conditional receiver appointment was included in both the trial court's letter ruling and subsequent final decree, the latter of which was signed after Husband had objected to that conditional appointment on several grounds. In its later November 24, 2021 receiver-appointment order, the trial court recited that it had reviewed the pleadings and considered counsel's arguments.

Based on the foregoing, and contrary to Husband's argument, the record shows that Husband received prior notice that Wife sought a sale of the residence as part of the just-and-right division and that Husband had an adequate opportunity to be heard on whether the *Hailey* preconditions to the order of such a sale had been satisfied. *See Hailey*, 331 S.W.2d at 302 (holding that trial court is required to make a just-and-right division of property "whenever the pleadings of either party show the existence of such property"); *Elliott v. Elliott*, 422 S.W.2d 757, 758–59 (Tex. App.—Fort Worth 1967, writ dism'd) (holding that trial court's discretionary power to appoint receiver to effect just-and-right division exists even "in the absence of an application therefor," citing Texas Jurisprudence note stating that trial court may appoint receiver without prior application when trial court "has full knowledge concerning the parties and their property"); *Gunther v. Gunther*, 367 S.W.2d 206, 207–09 (Tex. App.—Waco 1963, writ

46

dism'd) (rejecting argument that appointment of receiver to effect just-and-right division requires prior pleading); *cf. Norem v. Norem*, 105 S.W.3d 213, 216 (Tex. App.—Dallas 2003, no pet.) (explaining that, unlike receiverships authorized by other authority, Family Code temporary-order receiver appointments need not be supported by special pleading requirements or predicate showings other than that the party is "entitle[d] to a receiver" to protect and preserve the parties' property so that a just-and-right division may be made).

Despite the foregoing authority, Husband contends—without citation to authority—that the trial court was required to hold another evidentiary hearing to determine whether the conditions to receivership set forth in the decree had occurred. According to Husband, no evidence showed that the residence was not listed for sale by October 31, 2021, and the only indication in the record that the property had not been listed timely was "argument" by Wife's counsel. Husband ignores that he filed a pleading on November 1, 2021, arguing that it was "not possible" for him to comply with the trial court's order without first obtaining clarification of the decree. And when asked by the trial judge at the hearing on the motion to sign whether the time for agreement had passed, Husband's counsel conceded, "We are beyond the date stated in the order." Husband's argument ignores that the *necessity* for a receiver—which required specific finding that the home could not be partitioned in kind—was litigated at trial while whether the trial court's stated conditions for appointment of that receiver—agreement on a price and the listing of the home (the failure of either

47

one of which would result in a receiver appointment)—had occurred was not a point of contention.

## 2. Appointment

To the extent that Husband's third issue fairly includes the argument that the evidence did not support the appointment of a receiver,[46] we briefly address that complaint. *See* Tex. R. App. P. 38.1(f).

Although a trial court has broad power and discretion to appoint a receiver, the remedy is an extraordinarily harsh one that is to be used as a last resort; thus, in the just-and-right-division context, the trial court must determine that property cannot be partitioned in kind before appointing a receiver to sell property. *See Adkison*, 2007 WL 259550, at *6 (citing *Hailey*, 331 S.W.2d at 303); *Vannerson*, 857 S.W.2d at 673 (same). As we have previously detailed, the evidence supports the trial court's determination that the community property, without a sale of the marital residence, was not subject to partition in kind. Thus, we conclude that the trial court's order appointing a receiver was supported by sufficient evidence.

We overrule Husband's third issue challenging the receiver-appointment order.

---

[46]In his reply brief in No. 02-21-00420-CV, Husband challenges the trial court's failure to make additional findings of fact and conclusions of law upon his request. But because Husband did not raise this complaint in his initial brief or in his mandamus petition, we decline to address it. *See Bookout v. Shelley*, No. 02-22-00055-CV, 2022 WL 17173526, at *20 (Tex. App.—Fort Worth Nov. 23, 2022, no pet.) (mem. op.).

48

## V. Conclusion

Having overruled all of Husband's issues in the appeals, we affirm the trial court's judgment. Having determined that Husband's complaints are justiciable by appeal, we deny his petition for writ of mandamus. We also lift our January 13, 2022 stay order.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: March 23, 2023